## BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE: BABY FOOD
MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

MDL NO. 2997

_____/

### INTERESTED PARTY RESPONSE IN PARTIAL SUPPORT OF MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

Pursuant to Rule 6.2(e) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, Plaintiffs AG, HG, and XG in the matter of *AG, et al. v. Plum, PBC, et al.*, Case No. 3:21-cv-01600-YGR, respectfully submit this response to Plaintiffs Lori-Anne Albano, Myjorie Philippe, Rebecca Telaro and Alyssa Rose's ("Albano Plaintiffs") motion to transfer actions to the Eastern District of New York.  [D.E. 1].

i

## TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................................ii

TABLE OF AUTHORITIES ...............................................................................................iii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

    I.    Filed Cases as of April 13, 2021 ...................................................................... 2

    II.   Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods .......... 3

    III.  Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods Sparking National Outrage ................................................... 4

    IV.  Dangers of Toxic Heavy Metals to Babies and Children ............................................. 10

ARGUMENT ................................................................................................................... 12

    I.    The Small Number of Personal Injury Actions Are Not Fit for Centralization under 28 U.S.C. § 1407 ......................................................... 13

    II.   Should the Court Centralize all Related Actions, Centralization in the Northern District of California Would Be Most Convenient for Parties and Witnesses Because the Majority of Plaintiffs, Including One of the Defendants, Are Located There................ 16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Adderall XR (Amphetamine/Dextroamphetamine) Mktg., Sales Practices & Antitrust Litig.*,
   968 F. Supp. 2d 1343 (J.P.M.L. 2013) ..................................................................... 14

*In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*,
   804 F. Supp. 2d 1376 (J.P.M.L. 2011) ..................................................................... 14

*In re ClassicStar Mare Lease Litig.*,
   528 F. Supp. 2d 1345 (J.P.M.L. 2007) ................................................................. 17, 19

*In re Crest Sensitivity Treatment & Prot. Toothpaste Mktg. & Sales Practices Litig.*,
   867 F. Supp. 2d 1348 (J.P.M.L. 2012) ................................................................. 14, 15

*In re First Am. Fin. Corp. Customer Data Sec. Breach Litig.*,
   396 F. Supp. 3d 1372 (J.P.M.L. 2019) ............................................................ 1, 14, 15

*In re Mattel, Inc., Toy Lead Paint Prod. Liab. Litig.*,
   528 F. Supp. 2d 1367 (J.P.M.L. 2007) ................................................................. 17, 19

*In re Prevagen Prod. Mktg. & Sales Practices Litig.*,
   283 F. Supp. 3d 1379 (J.P.M.L. 2017) ..................................................................... 14

*In re Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Practices Litig.*,
   682 F. Supp. 2d 1347 (J.P.M.L. 2010) ..................................................................... 17

*In re: Lifewatch, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*,
   140 F.Supp.3d 1342 (J.P.M.L.2015) ......................................................................... 13

*In re: OxyElite Pro & Jack3d Prod. Liab. Litig.*,
   11 F. Supp. 3d 1340 (J.P.M.L. 2014) ....................................................................... 15

*Pat. Litig.*,
   547 F. Supp. 2d 1383 (J.P.M.L. 2008) ..................................................................... 17

**Statutes**

28 U.S.C. § 1407 ................................................................................................. i, ii, 13, 14

**Other Authorities**

2020 WL 588473 (J.P.M.L. Oct. 2, 2020) ...................................................................... 19

A Look at the Judicial Panel on Multidistrict Litigation,
   72 F.R.D. 211 (1977) ............................................................................................... 16

Manual For Complex Litigation (Fourth) § 20.131 (2004) .......................................................... 16

## INTRODUCTION

These lawsuits follow recent revelations that baby foods sold to unknowing parents and vulnerable infants within the U.S. contain astronomical quantities of toxic heavy metals, namely arsenic, lead, mercury, and cadmium.  The vast majority of the related cases are class actions alleging economic injuries, whereas there are only three personal injury actions filed alleging that exposure to defendants' baby foods caused neurodevelopmental disorders in small children, with two of the cases specifically alleging autism spectrum disorder ("ASD") and Attention Deficit Hyperactivity Disorder ("ADHD").  It is not often that opposing parties agree, but this is one of the rare instances where plaintiffs and defendants concur: that the personal injury actions do not warrant centralization.  However, should the Court centralize all related actions, Plaintiffs submit that the Northern District of California is the most appropriate venue for this MDL.

*First*, this Court has in the past repeatedly denied centralization of a small number of actions where parties can efficiently manage cases through cooperation of counsel, coordination, and other alternatives to centralization.  *See In re First Am. Fin. Corp. Customer Data Sec. Breach Litig.,* 396 F. Supp. 3d 1372, 1373 (J.P.M.L. 2019).  That is the case here.  There have only been three personal injury actions filed to date—pending in just two courts—compared to over eighty putative class actions pending in district courts through the country.  The same constellation of counsel represent the parties, with two out of the three personal injury actions being represented by the same counsel and pending before the same court in the Northern District of California.  Accordingly, the interests of efficiency, convenience of parties and witnesses, and judicial resources militate against centralizing the personal injury actions.

*Second*, notwithstanding some factual overlap between the personal injury and class actions, there are issues unique to the personal injury claims—such as medical causation, certain aspects of liability, and punitive damages—not relevant to the class actions, which are not concerned with medical causation or any specific personal injury.  Conversely, the class actions will focus on how to estimate class-wide economic damages, i.e., price premium or full-refund. This entails different experts and evidence for the personal injury claims compared with the class

1

actions. Thus, carving out the personal injury actions is not bound to disturb any centralized proceeding or result in inefficiencies—there are too few personal injury actions, and they involve fundamentally different issues than the class claims to warrant centralization, as acknowledged by defendants. *See* Defendants' Interested Party Response at 3.

*Third*, should the Court be inclined to centralize the personal injury and class actions, Plaintiffs submit that the Northern District of California is the best venue for this MDL. In addition to one of the defendants being located in the Northern District of California, the majority of plaintiffs and events in this litigation are anticipated to be centered in California. The state constitutes the major share of organic food consumption in the U.S. (most of the baby foods at issue in this litigation are sold as organic) and is the single largest producer of ingredients used to manufacture defendants' baby foods. And, California has the highest birth-rate compared to any other U.S. state, providing another reason to anticipate that the majority of plaintiffs will be located in California.

Moreover, the first class action in the country was filed in the Northern District of California and there are currently eight cases (including two out of the three personal injury actions) pending in that court, seven of which are before the Honorable Yvonne Gonzalez Rogers. As explained further below, Judge Rogers is an experienced and capable MDL judge who is currently overseeing a small MDL that should not pose any obstacles to centralizing the baby foods cases in her court. The Northern District of California is a well-resourced court that has successfully managed numerous MDLs. The court's location in the business hub of California's Bay Area lies in close proximity to two large international airports and numerous lodging, restaurant, and business services that can accommodate the efficient conduct of an MDL.

## FACTUAL BACKGROUND

### I.    Filed Cases as of April 13, 2021

This litigation involves two different theories of liability—one based on economic damages (the putative class actions) and one based on personal injury (the personal injury

actions).  Although both cases involve the presence of neurotoxic heavy metals in baby food, numerically, the personal injury actions are dwarfed by the number of class suits.  As of the date of this submission, there are only five plaintiffs—specifically children—in three complaints who allege that exposure to defendants' baby foods caused them neurodevelopmental disorders; whereas there are over eighty class actions pending throughout the country.  All of the pure personal injury plaintiffs are located in the Northern District of California; one is located in New York, although that case (*Walls, et al. v. Beech-Nut, et al.* Case No. 1:21-cv-00870) is primarily a class action with a personal injury component thrown in.

## II.     Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods

In October 2019, an alliance of nonprofit organizations, scientists and donors named "Happy Babies Bright Futures" ("HBBF"), dedicated to designing and implementing "outcomes-based programs to measurably reduce babies' exposures to toxic chemicals"[1], published a report investigating the presence of Toxic Heavy Metals in baby foods.[2]  The HBBF Report, which received little publicity, tested 168 different baby foods sold on the U.S. market and concluded that "[n]inety-five percent of baby foods tested were contaminated with one or more of four toxic heavy metals—arsenic, lead, cadmium and mercury, including that of defendants' baby foods.  All but nine of 168 baby foods contained at least one metal; most contained more than one."[3]  Specifically, the HBBF report identified "puffs and other snacks made with rice flour", "[t]eething biscuits and rice rusks", "infant rice cereal", "apple, pear, grape and other fruit juices", and "carrots and sweet potatoes" manufactured by baby food companies as particularly high in Toxic Heavy Metals.[4]

---

[1] https://www.hbbf.org/solutions.

[2] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) ("HBBF Report"), available at: www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

[3] *Id.* at 6.

[4] *Id.* at 10-11

The results of the HBBF report were consistent with that of the FDA which had, in 2017, detected one or more of the four Toxic Heavy Metals in 33 of 39 types of baby food tested.[5] However, the HBBF reported that "[f]or 88 percent of baby foods tested by HBBF—148 of 168 baby foods—FDA has failed to set enforceable limits or issue guidance on maximum safe amounts."[6]  To that end, the HBBF, along with other concerned stakeholders, urged the FDA to, among other measures, "[s]et health-protective standards for heavy metals, prioritizing foods that offer FDA the greatest opportunity to reduce exposure, considering additive effects of the multiple metals detected in foods, and explicitly protecting against neurodevelopmental impacts… Implement a proactive testing program for heavy metals in foods consumed by babies and toddlers…[and] [e]stablish a goal of no measurable amounts of cadmium, lead, mercury, and inorganic arsenic in baby and children's food, in recognition of the absence of a known safe level of exposure, and work with manufacturers to achieve steady progress."[7]  The HBBF also invited baby food manufacturers to share its goal of reducing "heavy metals in baby food to levels as low as reasonably achievable."[8]

## III.   Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods Sparking National Outrage

On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report detailing its findings that Toxic Heavy Metals—including arsenic, cadmium, lead, and mercury—were present in "significant levels" in numerous commercial baby food products.[9]  Four companies— Hain, Gerber, Nurture, and Beech-Nut —produced internal testing policies, test results for ingredients and finished products, and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits.  Three

---

[5] *Id.* at 6.
[6] *Id.* at 6.
[7] *Id*. at 8-9.
[8] *Id*. at 9
[9] *See generally* Subcommittee Rpt.

companies—Plum, [10] Walmart, and Sprout—refused to cooperate.[11]

The Subcommittee reported that the data submitted by the companies unequivocally revealed that a substantial number of the companies' finished products and/or ingredients used to manufacture the Baby Foods are tainted with significant levels of Toxic Heavy Metals, namely inorganic arsenic, lead, cadmium, and mercury.[12]  Specifically, the Subcommittee concluded the following:

**ARSENIC** was present in baby foods made by all responding companies:

- Nurture (HappyBABY) sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.

- Hain (Earth's Best Organic) sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic.

- Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic. Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."

- Gerber used high-arsenic ingredients, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic.

**LEAD** was present in baby foods made by all responding companies:

---

[10] Plum's parent corporation, Campbell's, responded to the Subcommittee's inquiries, and the Subcommittee Report references the parent corporation as opposed to Plum.  However, as Plum is the Defendant in this lawsuit, any references to the Subcommittee's findings regarding Campbell are attributed to Plum.  The same Baby Foods are at issue.
[11] Subcommittee Rpt. at 2.
[12] *Id*. at 2-3.

- Nurture (HappyBABY) sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead.

- Beech-Nut used ingredients containing as much as 886.9 ppb lead. It used many ingredients with high lead content, including 483 that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead.

- Hain (Earth's Best Organic) used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.

- Gerber used ingredients that tested as high as 48 ppb lead; and used many ingredients containing over 20 ppb lead.

**CADMIUM** was present in baby foods made by all responding companies:

- Beech-Nut used 105 ingredients that tested over 20 ppb cadmium. Some tested much higher, up to 344.55 ppb cadmium.

- Hain (Earth's Best Organic) used 102 ingredients in its baby food that tested over 20 ppb cadmium. Some tested much higher, up to 260 ppb cadmium.

- Sixty-five percent of Nurture (HappyBABY) finished baby food products contained more than 5 ppb cadmium.

- Seventy-five percent of Gerber's carrots contained cadmium in excess of 5 ppb, with some containing up to 87 ppb cadmium.

**MERCURY** was detected in baby food of the only responding company that tested for it:

- Nurture (HappyBABY) sold finished baby food products containing as much as 10 ppb mercury.

- Beech-Nut and Hain (Earth's Best Organic) do not even test for mercury in baby food.

- Gerber rarely tests for mercury in its baby foods.[13]

- These levels surpass the limits allowed by U.S. regulatory agencies.  To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and 5 ppb cadmium, and the EPA has capped the allowable level of mercury in drinking water at 2 ppb.  However, these limits were created in reference to *adult* exposure, not infants.  Compared to these thresholds, the test results of the Defendants' Baby Foods and their ingredients are hundreds of times above that allowed by the FDA and EPA for these toxic heavy metals.[14]

Compounding these troubling discoveries, the manufacturers set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards.  For example, the Subcommittee found that Hain (Earth's Best Organic) set an internal standard of 200 ppb for arsenic, lead, and cadmium in some of its ingredients.  But Hain routinely exceeded its internal policies, using ingredients containing 353 ppb lead and 309 ppb arsenic.  Hain justified these deviations based on "theoretical calculations," even after Hain admitted to FDA that its testing *underestimated* final product toxic heavy metal levels.[15]

As found by the Subcommittee, the companies have willfully sold—and continue to sell—contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products.  In August 2019, Hain held a closed-door meeting with the FDA during which Hain delivered a presentation to the agency acknowledging the Toxic Heavy Metal problem in its Baby Food.[16]  In the PowerPoint slides presented during

---

[13] *Id*. at 2-4.

[14] HBBF Rpt. at 19.

[15] *Id*. at 4-5.

[16] Hain, *PowerPoint Presentation to Food and Drug Administration: FDA Testing Result Investigation* (Aug. 1, 2019) ("2019 Hain & FDA Meeting"), available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2.pdf).

the meeting—only made public by the Subcommittee—Hain confirmed that some of the ingredients in its Baby Food contain as much as between 108 to 129 ppb of arsenic, specifically noting "[p]reliminary investigation indicates Vitamin/Mineral Pre-Mix may be a major contributing factor"[17].  Additionally, the presentation revealed that:

Hain's corporate policy to test only ingredients, not final products, underrepresents the levels of toxic heavy metals in baby foods.  In 100% of the Hain baby foods tested, inorganic arsenic levels were higher in the finished baby food than the company estimated they would be based on individual ingredient testing.  Inorganic arsenic was between 28% and 93% higher in the finished products;

Many of Hain's baby foods were tainted with high levels of inorganic arsenic—half of its brown rice baby foods contained over 100 ppb inorganic arsenic; its average brown rice baby food contained 97.62 ppb inorganic arsenic; and

Naturally occurring toxic heavy metals may not be the only problem causing the unsafe levels of toxic heavy metals in baby foods; rather, baby food producers like Hain may be adding ingredients that have high levels of toxic heavy metals into their products, such as vitamin/mineral pre-mix.[18]

Moreover, although Walmart, Plum, and Sprout refused to cooperate with the Subcommittee's investigation, independent data confirms that the Baby Food of these companies is similarly tainted.  For example, the HBBF Report observed that Walmart's Parent's Choice brand products contain 66 ppb inorganic arsenic, 26.9 ppb lead, 26.1 ppb cadmium, and 2.05 ppb mercury.[19]

| Brand | Food | Food type | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) | Metro area where purchased | Retailer |
|---|---|---|---|---|---|---|---|---|---|
| Parent's Choice (Walmart) | Little Hearts Strawberry Yogurt Cereal Snack - Stage 3, 9+ months | Snack - other | 56.1 | – | 5.2 | 26.1 | 0.941 | Charlottesville, VA | Walmart |
| Parent's Choice (Walmart) | Organic Strawberry Rice Rusks - Stage 2, 6+ months | Snack - teething biscuits & rice rusks/cakes | 108 | 66 | 26.9 | 2.4 | 2.05 | Charlottesville, VA | Walmart |

---

[17] *Id*. at *9.
[18] Subcommittee Report at 5-6
[19] *See* HBBF Report at 21, 22, 25-27.

Instead of producing any substantive information, Plum provided the Subcommittee with a self-serving spreadsheet declaring that every one of its products "meets criteria",[20] while declining to state what the criteria were.  Plum's self-serving testing summary speaks volumes since the summary does not show the levels of Toxic Heavy Metals that the testing found or the levels that would "meet criteria."  Plum also conceded that, for mercury (a powerful neurotoxin), the company has *no criterion* whatsoever, stating: "No specific threshold established because no high-risk ingredients are used."[21] However, despite Plum having no mercury threshold, it still marked every food as "meets criteria" for mercury.  The Subcommittee even commented that "[t]his misleading framing—of meeting criteria that do not exist—raises questions about what [Plum's] other thresholds actually are, and whether they exist."[22] Indeed, HBBF's independent testing confirms the presence of Toxic Heavy Metals in Plum's Baby Food:

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|---|---|---|---|---|---|
| Plum Organics Just Sweet Potato Organic Baby Food- 1, 4 months | 3.1*§ | -- | 5.6 | 2.3 | <0.142 |
| Plum Organics Just Peaches Organic Baby Food (Stage 1) | 7.2 | -- | 0.9* | <0.5 | <0.139 |
| Plum Organics Just Prunes Organic Baby Food- 1, 4 months & up | 7.6 | -- | 2.5 | <0.5 | 0.194* |
| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
| Plum Organics Pumpkin Banana Papaya Cardamom, 6 months & up | 2.4* | -- | 1.4* | 2.4 | <0.139 |
| Plum Organics Apple, Raisin, & Quinoa Organic Baby Food- 2 | 5.6* | -- | 2.2 | 1.9 | 0.145* |
| Plum Organics Little Teethers Organic Multigrain Teething Wafers- Banana with Pumpkin- Baby Crawler | 49.9 | -- | 1.4* | 6.3 | 0.726 |
| Plum Organics Mighty Morning Bar- Blueberry Lemon- Tots, 15 months & up | 40§ | 39 | 3.4 | 24.3 | <0.137 |

Sprout did not respond to the Subcommittee at all.  Again, the testing conducted by HBBF confirms that Sprout's Baby Foods are similarly tainted by substantial amounts of Toxic

---

[20] Campbell, *Product Heavy Metal Test Results* (Dec. 11, 2019), available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/12.pdf).
[21] *Id*. at 00046.
[22] Subcommittee Report at 45.

Heavy Metals:

| Brand | Food | Food type | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) | Metro area where purchased | Retailer |
|-------|------|-----------|----------------------|--------------------------|------------|---------------|----------------------|----------------------------|----------|
| Sprout | Carrot Apple Mango Organic Baby Food - 2, 6 months & up | Fruit and veggie - mixed | 6.1 | -- | 2.1 | 15.1 | < 0.131 | Charlottesville, VA | Wegmans |
| Sprout | Organic Quinoa Puffs Baby Cereal Snack - Apple Kale | Snack - puffs, contains rice | 107 | 47 | 39.3 | 41.5 | 1.31 | Washington, DC | amazon.com |

## IV.    Dangers of Toxic Heavy Metals to Babies and Children

According to the World Health Organization ("WHO"), Toxic Heavy Metals, specifically arsenic, cadmium, lead, and mercury, pose a "major public health concern" for children.[23]  The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health hazard."[24]  Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number *one* among substances present in the environment that pose the most significant potential threat to human health, followed by lead (second), mercury (third), and cadmium (seventh).[25]

The threat presented by Toxic Heavy Metals to children's health is widely shared by the global scientific community.  As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults. The elements' harmful consequences on children health include mental retardation, neurocognitive disorders, behavioral disorders, respiratory problems, cancer and cardiovascular diseases.  Much attention should be given to heavy metals because of their high toxicity potential, widespread use, and prevalence."[26]  Children and, even more so, babies have higher exposure to metals

---

[23] World Health Organization, *Children's Health and the Environment WHO training Package for the Health Sector* (October 2011), available at: https://www.who.int/ceh/capacity/heavy_metals.pdf.

[24] OSHA, *Toxic Metals*, available at: https://www.osha.gov/toxic-metals.

[25] ATSDR, *ATSDR's Substance Priority List* (2019), available at: www.atsdr.cdc.gov/spl/index.html#2019spl.

[26] Osman, et al., *Exposure routes and health effects of heavy metals on children*, 32 BIOMETALS 563–573 (2019), available at: https://link.springer.com/article/10.1007%2Fs10534-019-00193-5#citeas.

compared to adults because they consume more food in relation to their body weight and absorb metals more readily than adults by 40 to 90%.[27]   And, the mechanisms needed to metabolize and eliminate heavy metals are comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms and poorer immune systems than adults.[28]   For example, liver pathways that in adulthood metabolize absorbed arsenic do not mature until mid-childhood; un-excreted arsenic thus continues to circulate and is deposited in other organs.[29]   According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[30]   Thus, "the major windows of developmental vulnerability occur during infancy and early childhood due to continuing brain development after birth."[31]   In short, even small amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and children.

Specifically, all of the heavy metals found in large quantities in defendants' baby foods have been consistently associated with Autism Spectrum Disorder ("ASD") and Attention Deficit Hyperactive Disorder ("ADHD") in pediatric populations.   Recent meta-analyses, reviewing large bodies of prior research, confirm the causal associations: "After reviewing 14 studies on arsenic exposure, "[w]e concluded that there is consistent evidence supporting a positive association between early life [arsenic] exposure and diagnosis of ASD[.]"[32]   And,

---

[27] Stein, et al., *In harm's way: toxic threats to child development*, 23 J DEV BEHAV PEDIATR.1 S13–S22 (2002).

[28] Gorini, et al., *The Role of Heavy Metal Pollution in Neurobehavioral Disorders: a Focus on Autism* 1 REV. J. AUTISM DEV. DISORD. 1, 354–372 (2014), available at: https://link.springer.com/article/10.1007/s40489-014-0028-3.

[29] Del Rio, et al., *A comparison of arsenic exposure in young children and home water arsenic in two rural West Texas communities* 17 BMC PUBLIC HEALTH 850 1-13 (2017), available at: https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-017-4808-4.

[30] Roni Caryn Rabin, *Some Baby Food May Contain Toxic Metals, U.S. Reports* (NY TIMES, Feb 4. 2021), available at: https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html

[31] Gorini, et al. *supra.*

[32] Wang, et al., *Exposure to Inorganic Arsenic and Lead and Autism Spectrum Disorder in*

identifiable biomarkers, such as blood, urine, and hair samples, lend strength to the observed associations: "All three bio samples in the meta-analysis showed a positive association between Hg and ASD, with hair at a significant level and urine and blood at a highly significant level."[33] Similarly, with respect to ADHD, two large recent meta-analysis concluded that "exposure to lead and arsenic was independently associated with ADHD. These results are consistent with previous published work that has already revealed that both metals are potential neurotoxic for development"[34] and "[t]he evidence from the studies allowed us to establish that there is an association between lead and ADHD and that even low levels of lead raise the risk."[35]  In short, defendants' toxic baby foods have no business being the bodies of infants.

## ARGUMENT

The small number of personal injury actions are not fit for centralization.  And Defendants agree in their Interested Party Response.  See Defendants' Interest Party Response at 3.  As discussed below, this Court has repeatedly held that alternatives to centralization (such cooperation of counsel and coordination) are better suited in such circumstances.  And, carving out the personal injury claims would not disturb a centralized proceeding should one be created. The inherent contrast between the class actions and personal injury claims—with the latter involving unique issues such as medical causation—provide an additional reason for not centralizing this small number of personal injury actions with an MDL dominated by class claims.

That said, should the Court be inclined to centralize the personal injury and class actions,

---

*Children: A Systematic Review and Meta-Analysis*, 21 CHEM RES. TOXICOL. 32, 1904-1919 (2019), available at: https://pubmed.ncbi.nlm.nih.gov/31549506/.

[33] Sulaiman, et al., *Exposure to Aluminum, Cadmium, and Mercury and Autism Spectrum Disorder in Children: A Systematic Review and Meta-Analysis*, 33 CHEM. RES. TOXICOL. 11, 2699-2718 (2020), available at: https://pubmed.ncbi.nlm.nih.gov/32990432/.

[34] Muñoz, et al., *Attention deficit hyperactivity disorder and its association with heavy metals in children from northern Chile*, 226 INT. J. HYG. ENVIRON. HEALTH (2020), available at: https://europepmc.org/article/med/32106053.

[35] Donzelli, et al., *The Association between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review*, 16 INT. J. ENVIRON. RES. PUBLIC HEALTH 382, 1-14 (2019), available at: https://pubmed.ncbi.nlm.nih.gov/30700018/.

Plaintiffs submit that the Northern District of California is an appropriate venue for the location of this MDL.  As discussed below, the majority of Plaintiffs and a substantial portion of relevant facts are centered in California—a state which grows most of the ingredients used in the U.S. food supply, consumes the largest portion of organic foods (with the majority of products in this litigation being marketed as organic), has the highest rate of births out of any U.S. state, and is the location of one of the defendants, namely Plum.  Moreover, the first class action was filed in the Northern District of California and, as of the date of this filing, a total of seven out of the eight Northern District cases are pending before the Honorable Yvonne Gonzalez Rogers who has related the baby food cases to her docket.  Judge Rogers, an experienced and capable MDL judge, enjoys a well-resourced court that is currently overseeing a small MDL that should not pose a problem to centralizing the baby food cases in her court.  Furthermore, the Northern District of California is conveniently located for ease of travel and accommodation, being served by two national airports (San Francisco and Oakland) and numerous lodging and leisure establishments within easy reach from the courthouse.  The facts strongly support centralizing the cases in the Northern of District

## I.      The Small Number of Personal Injury Actions Are Not Fit for Centralization under 28 U.S.C. § 1407

Transfer is appropriate where: (A) "civil actions involving one or more common questions of fact are pending in different districts"; (B) transfer and coordination "will promote the just and efficient conduct of such actions"; and (C) transfer and coordination will serve "the convenience of parties and witnesses." 28 U.S.C. § 1407(a).  Furthermore, "where only a minimal number of actions are involved, the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate."  *In re: Lifewatch, Inc., Tel. Consumer Prot. Act (TCPA) Litig.*, 140 F.Supp.3d 1342, 1343 (J.P.M.L.2015).  The elements do not support centralization of the personal injury actions here.

As of this filing, there are only *three* actions, involving five plaintiffs, alleging personal injuries related to consumption of defendants' baby foods.  Indeed, although the number of class

actions has steadily increased since the filing of the first cases in early February—with more being filed each week—the same cannot be said for the personal injury suits. Two of the personal injury cases are pending in the same court before the same judge in the Northern District of California,[36] with the only other personal injury action pending in the Eastern District of New York. *See In re First Am. Fin. Corp. Customer Data Sec. Breach Litig.,* 396 F. Supp. 3d 1372, 1373 (J.P.M.L. 2019) ("There are a relatively small number of actions in this controversy, and most are pending in a single district. We have held that 'centralization under Section 1407 should be the last solution after considered review of all other options.'") (quoting *In re Best Buy Co., Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011)). Importantly, unlike the two pending California actions, which exclusively involve personal injury claims, the New York action (*Walls, et al. v. Beech-Nut, et al.* Case No. 1:21-cv-00870) is a class action with personal injury as a side non-class claim. Although the three cases involve common factual issues, "[t]he small number of actions suggests that cooperation and informal coordination by the involved courts and counsel should be feasible." *In re Prevagen Prod. Mktg. & Sales Practices Litig.,* 283 F. Supp. 3d 1379, 1380 (J.P.M.L. 2017) (citing *In re Crest Sensitivity Treatment & Prot. Toothpaste Mktg. & Sales Practices Litig.*, 867 F. Supp. 2d 1348, 1348 (J.P.M.L. 2012) (denying centralization where only three actions were sought to be consolidated and listing examples of mechanisms available to prevent redundant discovery)). Moreover, a handful of counsel represent the parties across the three cases, with plaintiffs in two out of the three actions being represented by the same firm. *See In re Adderall XR (Amphetamine/Dextroamphetamine) Mktg., Sales Practices & Antitrust Litig.*, 968 F. Supp. 2d 1343, 1345 (J.P.M.L. 2013) (denying centralization where "[a]ll three plaintiffs in the actions on the motion share counsel[.]"). Accordingly, "centralization would not necessarily serve the convenience of the parties and witnesses or promote the just and efficient conduct of the actions.

---

[36] Undersigned counsel has also filed one personal injury case in California state court and have filed a motion seeking a preferential trial setting within four months. *See Dr and JR v. Hain Celestial Group, et al.* (Super. Ct. County of Los Angeles, Case No. 21STCV09325).

In these circumstances, informal cooperation among counsel and coordination among the involved courts are … preferable to formal centralization." *In re Crest Sensitivity Treatment*, 867 F. Supp. 2d 1348; *see also In re First Am. Fin. Corp. Customer Data Sec. Breach Litig.*, 396 F. Supp. 3d at 1373 ("Even if the pending transfer motion does not eliminate the multidistrict character of this litigation, voluntary cooperation and coordination among the small number of involved courts appears eminently feasible.").

Furthermore, if an MDL is created for the class actions, carving out the personal injury cases would not disturb the centralized proceeding or result in inefficiency. The class suits involve different claims—economic harm—and defenses than the personal injury actions. Although there is bound to be *some* overlapping discovery, issues such as causation, punitive damages, and certain elements of liability are unique to the personal injury claims and will not be a focus of the class actions. *See In re: OxyElite Pro & Jack3d Prod. Liab. Litig.*, 11 F. Supp. 3d 1340, 1341 (J.P.M.L. 2014) (denying centralization because "false advertising actions…will not delve into the medical issues raised by the personal injury actions."). For example, in the personal injury claims, there will be substantial litigation concerning medical causation, and whether the exposure of babies to the levels of toxic heavy metals found in Defendants' baby foods can substantially contribute to the development of ASD and ADHD. This important issue, however, is not relevant to the class actions, which are not concerned with medical causation or any specific personal injury. Conversely, the class actions will focus on how to estimate class-wide economic damages, i.e., price premium or full-refund. This means the personal injury Plaintiffs will need almost entirely different experts and discovery than the class action Plaintiffs. And, while there would be some overlap regarding liability, this is a situation where separating the personal injury from the class claims makes sense.

This point is acknowledged by Defendants, who also oppose centralizing the personal injury actions for the very same reasons:

> Personal injury claims involve a host of complex and medical scientific issues that go well beyond, and are not implicated by, the false advertising class actions. Moreover, by their nature, these personal injury lawsuits will hinge on

> questions of causation and injury that will vary from product to product and from plaintiff to plaintiff. These lawsuits can be adjudicated separately, and there is no need to include them in any potential MDL of putative class actions asserting false advertising claims.

Defendants' Interested Party Response at 3.

If a significant number of personal injury actions are filed in various districts in the future, the Court may revisit centralization upon a party's transfer motion.  However, at this juncture, with so few cases and the relatively small cohort of counsel dealing with the personal injury claims, centralization of the three personal injury actions along with the class claims is not warranted and would simply lead to a needlessly complicated MDL.

**II.     Should the Court Centralize all Related Actions, Centralization in the Northern District of California Would Be Most Convenient for Parties and Witnesses Because the Majority of Plaintiffs, Including One of the Defendants, Are Located There**

Should the Court centralize the personal injury and class actions into a single MDL, Plaintiffs submit that centralization in the Northern District of California is most appropriate. The selection of a transferee court is based on a balancing test of several factors, none of which is dispositive.  *See* Manual For Complex Litigation (Fourth) § 20.131 (2004) (citing Robert A. Cahn, A Look at the Judicial Panel on Multidistrict Litigation, 72 F.R.D. 211, 214-15 (1977)). These factors include "where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges." *Id*.

Due to infancy of this litigation, many of these factors are not applicable.  For example, no case has progressed in any meaningful way and there has been no discovery.   Against this background, Plaintiffs believe the Northern District of California would be the better location for a combined personal injury and class action MDL.

There is no obvious location for this MDL.  The list of defendants is already fairly numerous and they are located throughout the United States, on both sides of the country.  *See,*

*e.g.*, *In re ClassicStar Mare Lease Litig.*, 528 F. Supp. 2d 1345, 1347 (J.P.M.L. 2007) ("Given the many parties and interests involved, there is no perfect choice for the transferee court."). Considering that national nature of this case, location of the MDL should focus on the facts and the capacity of the proposed courts.

On the facts, California, specifically the Northern District of California—the location of the first-filed case and one of the defendants, Plum, Inc.[37]—seems like the obvious choice.  *See In re Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Practices Litig.*, 682 F. Supp. 2d 1347, 1349 (J.P.M.L. 2010) ("[W]here the first-filed action is pending, stands out as an appropriate transferee forum."); *In re Halftone Color Separations ('809) Pat. Litig.*, 547 F. Supp. 2d 1383, 1384–85 (J.P.M.L. 2008) ("[I]n fact, we have expressly given the first-filed criterion some weight in selecting a transferee district.") (citing *In re Mattel, Inc., Toy Lead Paint Prod. Liab. Litig.*, 528 F. Supp. 2d 1367, 1369 (J.P.M.L. 2007)).

*First*, a substantial portion of the events giving rise to the claims against defendant Plum occurred in the Northern District of California, the location of Plum's headquarters.  Specifically, executive decisions pertaining to the manufacture, marketing, sale, and distribution of Plum's baby foods would have taken place at its Emeryville headquarters, a city in the San Francisco Bay Area.  As such, depositions of Plum employees and executives are likely to occur within California, specifically the Northern District of California.

*Second*, the majority of plaintiffs are anticipated to be located in California.  The overwhelming number of claims in this litigation concern baby foods that have been marketed and sold as "organic".  California makes up the largest proportion of the U.S. organic food market, with 41% of consumers who purchased organic foods as of 2018 being located in California, specifically within the cities of San Francisco, Oakland, and San Jose—all within the

---

[37] Although Plum recently surrendered its certification to conduct business in California—*after* the first string of cases were filed against it and its competitors—most of the alleged wrongful pre-suit conduct occurred in the Northern District of California and, upon information and belief, the majority of Plum's employees and executive personnel are still located in the Northern District of California.

Northern District of California.[38]  This statistic has remained more or less stable over the last

decade, with the Organic Survey from the USDA's National Agricultural Statistics Service

reporting in 2014 that California made up 41% of the national total for organic foods sales, $2.2

billion of the market.[39]  And,  California has the highest birth rate in the U.S. with 446,479 births

in 2019 (over twice the number of Florida) and approximately 2.4 million children under the age

of 5 reside in California.[40]  Accordingly, it is likely that the majority of plaintiffs in this

litigation—for both personal injury and class claims—will be concentrated in California.

*Third*, a substantial portion of the events giving rise to the claims in this litigation are

likely to be in centered in California.  The state grows the largest share of agricultural products

that these defendants use in their products.  For example, of the ingredients Nurture sources

domestically, well over 75% are grown at least in part on farms on the West Coast including in

California.[41]  Similarly, for berries and non-citrus fruits, California is responsible for almost

74% of organic sales value (~$728 million out of ~$990 million nationwide).[42]  Rice is a

particularly problematic ingredient (due its levels of arsenic) and California has the highest rice

---

[38] Statista, *Share of consumers who purchase organic foods in the United States in 2018, by state,* available at**:** https://www.statista.com/statistics/1011353/share-of-us-organic-buyers-by-state/.

[39] *These 10 states are consuming most of our organic food supply* (Business Insider, Oct. 4, 2015), available at: https://www.businessinsider.com/10-states-consuming-most-of-organic-food-supply-2015-10.

[40] Centers for Disease Control and Prevention, National Center for Health Statistics, *National Vital Statistics Reports*, Table 6 (Mar. 23, 2021), https://www.cdc.gov/nchs/data/nvsr/nvsr70/nvsr70-02-508.pdf; U.S. Census Bureau, Quick Facts on Population Estimates July 1, 2019, California, https://www.census.gov/quickfacts/fact/table/CA/PST045219 (approximately 6% of the total population of the estimated 39,572,223 residents).

[41] Happy Family Organics, *Happy Farms*, https://www.happyfamilyorganics.com/happy-farms/ (last visited Apr. 12, 2021).

[42] U.S. Department of Agriculture, National Agricultural Statistics Service, *2019 Organic Survey* at Table 1 (Oct. 2020), available at https://www.nass.usda.gov/Publications/AgCensus/2017/Online_Resources/Organics/ORGANICS.pdf.

yields in the nation and the counties with the largest production are in Northern California.[43]

 *Fourth,* practically, there are already eight cases, including the first-class action case (*Gulkarov*), in the Northern District of California, seven of which are before the same judge, the Hon. Yvonne Gonzalez Rogers (with the remaining case not yet before an Article III judge). Indeed, efforts are underway to consolidate the growing number of class actions pending before Judge Rogers.  Judge Rogers is a seasoned MDL judge, having served as an Article III judge for a decade and, prior to that, as a California state court judge for three years.  Indeed, this Panel has previously recognized Judge Rogers as an "able jurist who has experience presiding over complex, multi-district litigation." *National Ski Pass Insurance Litig.*, --- F. Supp. 3d ----, 2020 WL 588473, at *2 (J.P.M.L. Oct. 2, 2020).  In addition to the ski pass litigation, Judge Rogers has also managed *In re Lithium Ion Batteries Antitrust Litig.*, MDL No. 2420, and *In re Air Crash at San Francisco, California on July 6, 2013*, MDL No. 2497.   Judge Rogers currently has a small MDL before her, so adding baby foods should not be problematic.   Indeed, the Northern District of California has the capacity and wherewithal to handle this litigation—a point underscored by the excellent management of the Roundup MDL currently in that same district (a case involving a common product and widespread disease).  *See In re Classicstar Mare Lease Litig.*, 528 F. Supp. 2d at 1347 ("[T]he district's general docket conditions permit us to make the Section 1407 assignment knowing that the court has the resources available to manage this litigation.").  Lastly, the Northern District of California is located in the business hub of the California Bay Area.  Two large international airports (Oakland and San Francisco) serve the district as well as numerous lodging establishments, restaurants and business services within close proximity to the courthouse.

---

[43] U.S. Department of Agriculture, National Agricultural Statistics Service, *All Rice 2019: Production by County for Selected States*, https://www.nass.usda.gov/Charts_and_Maps/graphics/AR-PR-RGBChor.pdf; U.S. Department of Agriculture, National Agricultural Statistics Service, *2020 Rice Yield: Pounds and Percent Change from Previous Year* (Jan. 12, 2021), https://www.nass.usda.gov/Charts_and_Maps/graphics/ricemap.pdf.

## CONCLUSION

Plaintiffs oppose centralization of the small number of personal injury actions.  That said, should the Court centralize the cases, Plaintiffs support the Motion to Transfer these similar actions to a California district court.

Dated:  April 13, 2021          **BAUM, HEDLUND, ARISTEI & GOLDMAN, P.C.**

*/s/ R. Brent Wisner, Esq.*
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@baumhedlundlaw.com
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
Telephone:  (310) 207-3233
Facsimile:   (310) 820-7444

*Counsel for Plaintiffs*